DANIEL GIRALDI, a Minor, by Thomas Giraldi, His Father and Next Friend, *et al.*, Plaintiffs-Appellants, v. COMMUNITY CONSOLIDATED SCHOOL DISTRICT No. 62 *et al.*, Defendants-Appellees.

First District (1st Division)   No. 1—93—2023

Opinion filed March 29, 1996.—Rehearing denied May 20, 1996.

CAMPBELL, P.J., dissenting.

Robert W. Karr & Associates, Ltd., and David A. Novoselsky & Associates, both of Chicago (David A. Novoselsky and Linda A. Bryceland, of counsel), for appellants.

Williams & Montgomery, Ltd., of Chicago (James K. Horstman, Barry L. Kroll, C. Barry Montgomery, and Lloyd E. Williams, Jr., of counsel), for appellee Septran, Inc.

JUSTICE WOLFSON delivered the opinion of the court:

During the 1983-84 school year Daniel Giraldi attended the morning kindergarten session at Forest Elementary School in Des Plaines, within District 62. He was transported to school on a school bus owned by Septran, Inc. The bus was driven by James Lamson.

On May 14, 1986, Lamson pleaded guilty but mentally ill to a charge of "aggravated criminal sexual assault on Danny Giraldi" committed during the 1983-84 school year.

Daniel, by his father and next friend, Thomas Giraldi, brought suit against Lamson, Septran, and Community Consolidated School District 62. The lawsuit sought money damages against the defendants for Lamson's sexual abuse of Daniel.

There was a jury trial. This case concerns several trial court rulings that preceded a "no liability" verdict for the defendants. One of these rulings requires us to decide whether it was error to allow a defendant's lawyer to take the stand to attack the credibility of a plaintiff's witness.

We affirm the judgment entered for the defendants.

PROCEEDINGS

The complaint contained four counts: (1) that Septran failed to exercise reasonable care in the operation of its business and was careless and negligent in its hiring, investigation and supervision of Lamson; (2) that Septran was guilty of wilful and wanton misconduct in its hiring, investigation, and supervision of Lamson; (3) that Lamson, while employed as a school bus driver by Septran and in the course of his duties, physically and sexually abused Daniel during the 1983-84 school year; and (4) that District 62, owing Daniel a duty of reasonable care, carelessly and negligently entered into a contract for services with Septran, failed to investigate the bus drivers hired by Septran, failed to investigate Lamson, and failed to supervise Septran in the fulfillment of the contract.

On January 4, 1993, Lamson moved to sever the case against him from the other defendants' case based on a claim of undue hardship. Because an unopposed summary judgment had been entered against Lamson, the only issue remaining against him was the amount of damages to be assessed. Lamson (who was incarcerated) was without funds to pay an attorney to represent him during what promised to be a lengthy trial.

Later, Septran and District 62 also filed motions asking that Lamson be severed from the case. They argued that they would be unfairly prejudiced if Lamson's case were tried simultaneously with theirs. The motions were granted.

The case against Septran and District 62 was tried before a jury. At the close of the case, the trial court removed from the jury's consideration the issue of wilful and wanton misconduct by the defendants, as well as the issue of negligent hiring. After hearing closing argument and receiving instructions from the court, the jury found no liability on the part of either defendant.

EVIDENCE

On Mondays, Tuesdays, Wednesdays, and Fridays (Daniel's mom drove him to school on Thursdays, which was her day off), Daniel was taken to a babysitter's around 7:50 a.m., where he was picked up by the school bus, which was scheduled to arrive between 8:20 and 8:25 in the morning. Daniel was the first child to board the bus.

On two occasions the babysitter noticed Lamson hug Daniel when he entered the bus. This information was given to Mrs. Giraldi, who testified that she reported this to Daniel's teacher. The teacher, according to Mrs. Giraldi, assured her that it was nothing to worry about.

Mrs. Giraldi never pursued this lead any further. Even though, as she testified, she later discovered blood in Daniel's underwear on various occasions and Daniel expressed anxiety about attending school, she never made any further inquiries. She never brought the information she had to the attention of the principal, the school district, or the bus company. Mrs. Giraldi did not suspect that her son was molested until March 1985, when she saw Lamson's picture in the newspaper.

Daniel's school teacher, Mrs. Niles, testified that she did not recall Mrs. Giraldi telling her about Lamson "hugging" Daniel. In fact, she could not recall any specific instance of speaking with Mr. or Mrs. Giraldi. She indicated, however, that "hugging" would not have necessarily alerted her to a problem since five-year-olds often need reassurance. She often hugged the children she taught.

Mrs. Niles remembered Daniel as a pleasant, average student. He got along with the other students, she said, and his behavior was age appropriate. Based on her observations of Daniel's progress that year, along with his scores in a "readiness test" administered by the school, Daniel was promoted to first grade. Attendance records for the 1983-84 school year also showed that Daniel had been absent seven days that year, but never was tardy.

Mrs. Johnson, the principal at Forest Elementary, and Sheryl Anderson, the bus monitor who supervised the arrival and departure of school buses at Forest Elementary, testified that they did not remember Lamson's bus as being unusually late during the 1983-84 school year. Lamson was occasionally late, but this was not an uncommon event for school buses.

According to their testimony, whenever any school bus was late the school called Septran. Septran would then contact the bus, which was equipped with a radio. Once Septran discovered the reason for the bus running late, Septran would call the school back to report what the problem had been. In their opinion, inquiries about lateness

were always adequately explained. No records were kept regarding the number of times buses were late throughout the 1983-84 school year.

Evelyn Markowski, the Septran employee who hired Lamson, and Sergeant Wolter, the police officer who investigated Lamson's criminal case, both testified that Lamson had no criminal background and no history of psychological problems. Markowski further noted that when Lamson was hired by Septran in 1983, he already possessed a valid school bus driver's permit. Holding such a permit meant that he had fulfilled all of the State's statutory requirements for the issuance of such a permit.

By statute, a school bus driver's permit will not be issued unless the applicant has passed a written test and a driving test; has a class B or C driver's license; passes a physical examination to check physical and mental health; has had a course in first aid and driving safety; has had no more than two moving traffic offenses within the past year; has no record of reckless driving while intoxicated, manslaughter, or reckless homicide; has no convictions for a number of criminal offenses including murder, rape, and deviate sexual conduct; has no history of repeated violations of traffic laws and ordinances; has never caused an accident resulting in the death of another; and has never been adjudged to be afflicted with mental disability or disease. The permit must be renewed annually.

When Lamson applied for a job, Markowski made sure that his bus driver's permit was valid. She also checked Lamson's employment history. Davidsmeyer, Lamson's previous employer, was contacted. Davidsmeyer confirmed that Lamson had been driving a school bus for special education children for the past four years. There were no reported problems.

Lamson was let go, Davidsmeyer said, because of lateness and tardiness. It was explained, however, that Lamson had a second job, which sometimes caused him to be late. Also, Lamson had a tendency to run late on the bus route because he was friendly with the parents of the children and stopped to speak with them.

At the time he applied with Septran, Lamson had also maintained a job with Best Western for five years. Markowski contacted this employer, too. No negative reports were obtained.

Markowski admitted that Septran received three complaints about Lamson during the 1983-84 school year. These complaints, according to Markowski, pertained solely to the bus being late along its route. This was a common complaint regarding school buses, she explained.

In response to the first complaint against Lamson, Markowski

spoke with Lamson directly. After the second complaint, she placed a person on Lamson's bus for two days to supervise his driving and to determine whether he was driving the route properly. After the third complaint, she had someone "tail" Lamson's bus without his knowledge. In each instance it was determined that Lamson was driving the bus route correctly.

The plaintiff called Lamson as a witness. He testified that he drove a school bus for Septran during the 1983-84 school year and admitted that Daniel was on his route. Lamson further admitted that on May 14, 1986, he pleaded guilty but mentally ill to "aggravated criminal sexual assault on Danny Giraldi." He testified, however, that he did so to avoid trial. He denied hugging, kissing, or fondling Daniel.

The most controversial evidence came from Nancy Levin, the mother of two children who boarded Lamson's school bus immediately after Daniel's stop.

Levin testified that she was told by another Septran bus driver that Lamson's bus was parked along the street. This bus driver suggested that Levin call Septran to complain. Levin said that this information prompted her to call Septran.

Levin testified that she told Septran about the bus being parked. In her deposition, however, Levin said she called about the bus being late. She did not say in her deposition that she told Septran about the bus being parked. In that deposition she never was asked directly whether she told Septran about the bus being parked.

Defense counsel impeached Levin with her statements in the deposition. In addition, counsel was allowed to impeach Levin with a conversation she had with him in the courthouse corridor just before she testified.

Levin testified that she did not construe the information about the parked bus as evidence of sexual abuse. She continued to send her children to school on the bus that school year.

There was no evidence establishing where the bus was parked or whether Daniel was seen on the bus when it was parked. Marrinson, Daniel's babysitter, testified that the bus was sometimes late arriving at Daniel's stop and that the bus would sometimes park along the street, waiting for Daniel if he was not ready when it arrived.

Based on the above evidence, the jury held that neither District 62 nor Septran was liable for the injury to Daniel.

OPINION

TESTIMONY BY DEFENSE COUNSEL

Plaintiff claims that the trial court erred when it refused to grant

a mistrial or disqualify defense counsel from the case based on counsel's conduct at trial with regard to witness Nancy Levin. Plaintiff contends that counsel's cross-examination of Levin and his testimony impeaching her placed him in the improper position of directly challenging the veracity of a key plaintiff's witness.

■ Courts should be extremely reluctant to allow attorneys to testify for their clients while representing them at trial. An attorney should be allowed to testify in a case he is trying only when the court, in the exercise of its discretion, deems it necessary. *Andrea Dumon, Inc. v. Pittway Corp.*, 110 Ill. App. 3d 481, 490, 442 N.E.2d 574 (1982). The Illinois Code of Professional Responsibility, which guides an attorney's professional conduct, provides that an attorney may testify without withdrawing from the case when his withdrawal would work a substantial hardship on his client. See 87 Ill. 2d R. 5—102(b)(4).

■ An attorney is not incompetent to testify. *In re Estate of Ragen*, 79 Ill. App. 3d 8, 398 N.E.2d 198 (1979). If an attorney has been handling a case for a long period of time and an unanticipated development or surprise makes the attorney's testimony necessary, it is not improper for the trial court to allow counsel to testify. *Andrea Dumon, Inc. v. Pittway Corp.*, 110 Ill. App. 3d at 490.

When the defense lawyer in this case took the stand, his direct testimony consisted of four questions and answers. In the courthouse hallway, he said, he asked Levin whether she told Septran "about a bus being parked around the corner." Her answer was: "No, I did not."

The plaintiff's lawyer then cross-examined the defense lawyer at length, taking up more than 60 pages of the record. During cross, plaintiff's lawyer reviewed every one of Levin's statements, highlighting the inconsistencies that brought the defense lawyer to the witness stand.

■ We do not approve of what happened here. Defense counsel placed himself in a predictable ethical morass when he decided to talk to Mrs. Levin just before she testified. Even though he downplayed his own testimony during final argument, conceding that Levin may have been "confused," the fact remains that he was pitting his own credibility against that of a witness.

The trial judge should have required the defense to forgo the testimony. There was no dire need for it. Levin had been impeached by the omission in her deposition. Circumspection dictated judicial intervention when the first foundation question was asked of Levin by defense counsel. There was a need for early damage control.

We have reviewed the record to determine whether the impropri-

ety could have had any impact on the final result. In retrospect, we find, as the trial judge did in post-trial proceedings, that defense counsel's testimony could have had little or no effect on the outcome of the case.

Whether the bus was parked around the corner mattered little. There was no *respondeat superior* claim in this case. The controlling issue always was whether the defendants knew or should have known Lamson was a physical danger to his young passengers. The record is barren of any such evidence and Levin could not provide it.

Under the circumstances, we cannot say the trial court abused its discretion by allowing defense counsel to testify. In a closer case, we would have grave difficulty reaching that conclusion.

## SEVERANCE OF LAMSON'S CASE AND RULINGS ON EVIDENCE

■ Lamson's case was severed shortly before jury selection began. Plaintiff contends that severance severely prejudiced his "ability to present evidence to the jury of precisely what had occurred to Danny Giraldi as well as the injury sustained."

Plaintiff is complaining about a situation he, at least in part, brought about. Before trial, plaintiff moved for summary judgment against Lamson. His motion was unopposed. The trial judge entered an order granting the summary judgment on liability.

All that remained against Lamson was the damages issue. The trial judge rightly was concerned that evidence admissible against Lamson on the damages issue would not be admissible against Septran and the school district.

Events at trial justified the judge's concern.

Lamson was called to the stand by the plaintiff. He admitted pleading guilty but mentally ill to the charge of sexually abusing Daniel during the 1983-84 school year. He then was asked one question about sexual contacts with the boy: "Q. During the school years 1983 and 1984, did you hug, kiss, and fondle Danny Giraldi?"

Lamson's answer: "No, I did not."

Faced with that denial, plaintiff then sought other ways to get evidence of specific acts of abuse before the jury.

First, he attempted, under the aegis of impeachment, to introduce the transcript of Lamson's guilty plea proceeding in the criminal court.

As part of the stipulated plea agreement, the prosecutor had read a statement of the facts the State would present if the case were to proceed to trial. It contained Daniel Giraldi's expected testimony that Lamson performed specific sexual acts on the boy while they

were in the school bus. After the statement of facts was read, Lamson's lawyer said: "that would be the stipulated State's evidence, Judge."

The trial judge in this civil case barred the evidence. We agree with that decision for several reasons.

First, the statement by the prosecutor in the criminal case was not Lamson's statement. Its purpose was to demonstrate a factual basis for the guilty plea. Under the circumstances, we do not see how the statement could have been used against Lamson in the civil trial, even if he were being tried with the other defendants on a damages-only issue.

Second, anything the prosecutor said in the criminal proceeding would be inadmissible hearsay as to Septran and the school district. See *Beccue v. Rockford Park District*, 94 Ill. App. 2d 179, 236 N.E.2d 105 (1968). It would be hearsay as to them whether or not severance was granted. Any agency relationship between Lamson and Septran had ended long before the guilty plea was entered. See *Fakhoury v. Vapor Corp.*, 218 Ill. App. 3d 20, 578 N.E.2d 121 (1991).

Third, with Lamson severed, the evidence had no relevance to the plaintiff's case against Septran and the school district. This was a negligent hiring and negligent supervision case. It did not proceed on an agency theory. If Lamson were on trial, the evidence, assuming it could be ascribed to Lamson as an admission, would have had slight relevance to the damages issue, no relevance to the case against the other two defendants.

It is no answer to say, as the plaintiff does, that the trial court could have given a limiting instruction to the jury. The efficacy of such an instruction is dubious, at best, given the emotional content of the proffered evidence. The prejudice to the defendants would have been palpable, the probative value of the evidence slight. See *Tellone v. North Shore Dodge, Inc.*, 271 Ill. App. 3d 885, 649 N.E.2d 625 (1995).

The plaintiff's problem in this case is that Daniel Giraldi was not able to testify. That sad circumstance did not change with the severance. If the plaintiff believed he needed more time to marshall his evidence, he could have asked for it. He did not. Plaintiff's problems with proof had nothing to do with the severance.

A motion to sever is addressed to the sound discretion of the trial court, "and its decision will not be disturbed absent an abuse thereof." *Fedt v. Oak Lawn Lodge, Inc.*, 132 Ill. App. 3d 1061, 1067, 488 N.E.2d 409 (1985). Granting the severance in this case was not an abuse of discretion.

Once the case was severed, the trial court did not abuse its discretion when it barred the prosecutor's fact statement. The ruling was

consistent with the rules of evidence and caused no unfair prejudice to plaintiff's legitimate interests.

Plaintiff made another attempt to get information about the sexual abuse acts before the jury. He asked his medical expert to testify to the facts that helped form his diagnosis of Daniel's condition. The expert's understanding of the sexual abuse came from the police report, which contained Daniel's statements.

■ The plaintiff contended the evidence was admissible under Federal Rule of Evidence 703, which has been adopted by the Illinois Supreme Court. See *Wilson v. Clark*, 84 Ill. 2d 186, 417 N.E.2d 1322 (1981).

Rule 703 provides that an expert may testify to facts or data on which he bases his opinion if they are of a type reasonably relied on by experts in that field. They do not have to be admissible in evidence.

Rule 703 did not create an exception to the hearsay rule. The facts or data relied on by the expert are not admitted for their truth. They are admitted "for the limited purpose of explaining the basis for the expert witness' opinion." *City of Chicago v. Anthony*, 136 Ill. 2d 169, 185, 554 N.E.2d 1381 (1990).

■ A trial judge can prevent an expert from testifying to the facts and data that support an opinion "when [their] probative value in explaining the expert's opinion pales beside [their] likely prejudicial impact or [their] tendency to create confusion." *City of Chicago v. Anthony*, 136 Ill. 2d at 185.

The police report could not become substantive evidence. It was double hearsay—Daniel's statements to a police officer who wrote them down in a report.

If the expert testified to the contents of the report to explain his opinions, there would have been a grave danger of unfair prejudice. No limiting instruction could ameliorate the risk that the jury would be persuaded by emotion and sympathy to misuse the evidence. The expert and other witnesses testified to the devastating impact the sexual abuse had on Daniel's life. Agonizing detail was not required.

There is an additional reason why the trial judge's ruling is not error. The expert's testimony went only to the issue of damages. The jury never reached that issue. Since the expert's underlying facts and data had no relevance to the liability question, the trial court's refusal to admit them is a moot issue.

## EXCLUSION OF THE DAVIDSMEYER FILE

At trial, plaintiff wanted to offer into evidence the personnel file from Davidsmeyer, Lamson's previous employer. Defendants moved

*in limine* to exclude the file. The trial court ruled in favor of defendants on the motion.

Plaintiff contends that the trial court erred in excluding the file from evidence because it was relevant to the issue of negligent hiring. The test is whether the trial court's ruling was a clear abuse of discretion. *Gill v. Foster*, 157 Ill. 2d 304, 626 N.E.2d 190 (1993).

■ A cause of action for negligent hiring is proved by evidence that the employer knew or reasonably should have known the person who was hired was unfit for the job "in the sense that the employment would place the employee in a position *where his unfitness* would create a foreseeable danger to others." (Emphasis added.) *Carter v. Skokie Valley Detective Agency, Ltd.*, 256 Ill. App. 3d 77, 80, 628 N.E.2d 602 (1993). It must be a "particular unfitness" which creates a danger of harm to others. See *Huber v. Seaton*, 186 Ill. App. 3d 503, 508, 542 N.E.2d 464 (1989). In addition, any negligence in hiring or retaining the employee must be the proximate cause of the plaintiff's injuries. *Bates v. Doria*, 150 Ill. App. 3d 1025, 502 N.E.2d 454 (1986).

■ Here, plaintiff claims the Davidsmeyer file "reflected a history of tardiness, absenteeism and irregular schedules" and "indicated that Lamson was fired *** with instructions that he was not to be rehired." But it wasn't tardiness, absenteeism, or irregular schedules that caused harm to Daniel. Daniel was injured because Lamson sexually abused him. The file contained nothing that would have placed Septran on notice of this "particular unfitness." The trial court did not abuse its discretion by refusing to admit the Davidsmeyer file.

Besides, plaintiff elicited testimony from Septran's employee, Markowski, regarding the information she learned from Davidsmeyer about Lamson's employment history. She testified that Davidsmeyer told her about Lamson's record of tardiness and irregular schedules. This information was before the jury without the admission of the personnel file.

## DISMISSAL OF THE NEGLIGENT HIRING COUNT

■ First, a procedural point. Septran contends the trial court's refusal to submit the negligent hiring count to the jury is not properly before this court. Plaintiff waived the point, Septran contends, by his failure to submit a jury instruction on the issue.

We do not agree. By the time of the instructions conference, the trial court had directed a verdict on the issue. It no longer was before the jury. Submitting a jury instruction would have been pointless. There was no waiver. We will consider the issue.

■ The trial court did not err when it declined to submit the negligent hiring count to the jury. There was no evidence that Septran knew or should have known the hiring of Lamson would create a danger of harm to third persons. A cause of action for negligent hiring "must establish that a 'particular unfitness' of an applicant creates a danger of harm to a third person which the employer knew, or should have known, when he hired and placed this applicant in employment where he could injure others." *Huber v. Seaton*, 186 Ill. App. 3d 503, 508, 542 N.E.2d 464 (1989); *Fallon v. Indian Trail School, Addison Township School District No. 4*, 148 Ill. App. 3d 931, 935, 500 N.E.2d 101 (1986). There was no negligent hiring here.

The only thing Septran could have known was that Lamson had a tendency to be late. There is no factual or logical relationship between that knowledge and the attack on Daniel. Even if Septran was negligent in hiring a driver who had trouble being on time, that does not establish a proximate cause relationship to the injury to Daniel. See *Carter v. Skokie Valley Detective Agency, Ltd.*, 256 Ill. App. 3d 77, 80-81, 628 N.E.2d 602 (1993). Without that relationship, there is no cause of action. See *Escobar v. Madsen Construction Co.*, 226 Ill. App. 3d 92, 94, 589 N.E.2d 638 (1992).

INSTRUCTION ON DUTY OF CARE

■ Plaintiff contends that the trial court erred when it rejected plaintiff's jury instruction No. 13, which was a modified version of Illinois Pattern Jury Instructions, Civil, No. 100.01 (3d ed. 1991). The instruction offered by plaintiff would have told the jury that the school bus company "has a duty to its passengers to use *the highest degree of care* consistent with the mode of conveyance used." (Emphasis added.)

Buses engaged in the transportation of children, whether a private or common carrier, owe their passengers a duty "to operate the bus with the highest degree of care." See *Garrett v. Grant School District No. 124*, 139 Ill. App. 3d 569, 487 N.E.2d 699 (1985). This would be the standard of care owed if defendants were being sued on a theory of vicarious liability. They were not.

The causes of action being tried in this case were brought under the theories of negligent supervision and negligent hiring. We can find no basis for holding defendants to a higher degree of care under these circumstances.[1]

---

[1]The dissent relies on *Chicago & Alton R.R. Co. v. Pillsbury*, 123 Ill. 9, 14 N.E. 22 (1887). In that case, a mob of union strikers stormed a train that was

## MANIFEST WEIGHT OF THE EVIDENCE

█ Plaintiff's last contention is that the jury's verdict was against the manifest weight of the evidence. We do not agree.

Plaintiff alleged that District 62 and Septran were negligent in carrying out their responsibility of selecting and supervising the persons connected with providing transportation to the young school-children of District 62. They failed to present evidence that supported the allegations.

Viewed in the light most favorable to the plaintiff, the evidence, at best, established that Lamson was late in picking up the children at their stops, arriving at school, and may have been parked along the street prior to picking up Levin's children. Plaintiff presented no evidence from which one could conclude that anyone would have been placed on notice that Lamson was a dangerous person to hire or keep as a school bus driver.

## CONCLUSION

The judgment entered by the circuit court on the jury verdict in favor of the defendants is affirmed.

Affirmed.

BRADEN, J., concurs.

PRESIDING JUSTICE CAMPBELL, dissenting:
I respectfully dissent.

The majority opinion acknowledges that the defendants were transporting children and owed those children the duty to operate its buses with the highest degree of care. 279 Ill. App. 3d at 692, citing *Garrett v. Grant School District*, 139 Ill. App. 3d 569, 487 N.E.2d 699 (1985). However, the majority "can find no basis for holding defendants to a higher degree of care" to this minor plaintiff because they were not being sued on a theory of *respondeat superior*. 279 Ill. App. 3d at 692.

A school district transporting students by bus is to be held to the same standards of care as are imposed on a private party operating as a common carrier. *Garrett*, 139 Ill. App. 3d at 574-75, 487 N.E.2d

---

carrying nonunion workers. A passenger was shot. Because the railroad knew or should have known the mob's intentions, a higher degree of care than ordinarily imposed was justified. The case turned on its peculiar facts, which bear no resemblance to the negligent hiring claim in this case. *Pillsbury* had nothing to do with "employment practices."

at 702. It has long been held that a carrier of passengers is obligated to use the highest standard of care in regard to its employment practices. See *Chicago & Alton R.R. Co. v. Pillsbury*, 123 Ill. 9, 21, 14 N.E. 22, 23 (1887). This high standard of care is imposed because the passenger must rely solely on the carrier to provide fit employees and cannot insure his or her personal safety. *Pillsbury*, 123 Ill. at 22, 14 N.E. at 23-24. Thus, a carrier must use reasonable care to *discover and prevent* danger to a passenger at all times and under all circumstances; this includes protection from foreseeable dangerous and violent conduct of fellow passengers or others. See, *e.g.*, *Pillsbury*, 123 Ill. at 22, 14 N.E. at 24.

It is not the precise pattern of events that must be foreseeable; rather, it is the risk of harm or danger to the one to whom the duty is owed. *Slager v. Commonwealth Edison Co.*, 230 Ill. App. 3d 894, 904, 595 N.E.2d 1097, 1103 (1992); see *Neering v. Illinois Central R.R. Co.*, 383 Ill. 366, 380, 50 N.E.2d 497, 503 (1943). In a negligent hiring or supervision case, even a noncarrier employer must exercise that degree of care as a reasonably prudent person would exercise in view of the consequences that might reasonably be expected to result if an incompetent, careless, or reckless agent was employed. See *Western Stone Co. v. Whalen*, 151 Ill. 472, 485, 38 N.E. 241, 244 (1894); *Malorney v. B&L Motor Freight, Inc.*, 146 Ill. App. 3d 265, 268, 496 N.E.2d 1086, 1088-89 (1986).

As the majority opinion notes, a bus driver's permit will not issue unless the applicant has no convictions for a number of criminal offenses, including rape and deviate sexual conduct. See 625 ILCS 5/6—106.1 (West 1992); 279 Ill. App. 3d at 685. Our legislature foresaw the type of danger at issue in this case; the statute supports the public policy reasons for imposing the high standard of care announced in *Pillsbury*. Also, the reasonably foreseeable consequences of the negligent supervision are grave.

In sum, there is ample basis in the law for holding the defendants to the highest standard of care in this case. The trial court erred in refusing to allow the minor plaintiff to amend his complaint. See 735 ILCS 5/2—616(a) (West 1992). The trial court committed reversible error by failing to instruct the jury on the proper duty owed by the defendants. *Palmer v. Mount Vernon Township High School District 201*, 269 Ill. App. 3d 1056, 647 N.E.2d 1043 (1995).

The majority opinion also holds that the trial court did not err in severing Lamson from the case and excluding evidence of the factual basis for Lamson's plea of guilty but mentally ill (GBMI) to the charge of aggravated criminal sexual assault. An action may not be severed when it prejudices a substantial right of the plaintiff. See 735 ILCS

5/2—1006 (West 1992). The plaintiff has a right to introduce evidence to prove its theory of the case. *Sanchez v. Black Brothers Co.*, 98 Ill. App. 3d 264, 266, 423 N.E.2d 1309, 1311 (1981).

The gravamen of negligent supervision is that the defendant breached a duty to control a supervised person who committed a wrong against the plaintiff. See *Oakley Transport, Inc. v. Zurich Insurance Co.*, 271 Ill. App. 3d 716, 724-25, 648 N.E.2d 1099, 1106 (1995). The negligence of the supervisor is, by definition, derivative of the wrongdoing of the supervisee. *Oakley Transport, Inc.*, 271 Ill. App. 3d at 725, 648 N.E.2d at 1106. Thus, evidence of Lamson's wrongdoing is relevant not only to the claim against Lamson, but also to the claim against Septran and District 62 on the elements of causation and damages. The majority's contrary conclusion that such evidence would have only "slight relevance" as to Lamson is unsupported.

That conclusion rests in part on the majority opinion's prior unsupported assertion that the factual basis for Lamson's GBMI plea is not an admission by Lamson. The prosecutor's statement was that "[i]t would be stipulated that these events occurred *** on the date and time in question, as alleged in the indictment." Moreover, a GBMI plea admits every material fact alleged in an indictment and all elements of a charged offense. See *People v. McLain*, 226 Ill. App. 3d 892, 897, 589 N.E.2d 1116, 1120 (1992). Even if the prosecutor's statement was not Lamson's, his silence could be deemed an admission of the truth of the prosecutor's statement which would have been admissible if he had not been severed from the case. See, *e.g.*, *Friedland v. Allis Chalmers Co. of Canada*, 159 Ill. App. 3d 1, 7, 511 N.E.2d 1199, 1204 (1987); see also *Mayol v. Summers, Watson & Kimpel*, 223 Ill. App. 3d 794, 807, 585 N.E.2d 1176, 1184 (1992) (admission of party opponent is substantive evidence).

The majority opinion concludes that the prosecutor's statement is hearsay as to Septran and District 62 because Lamson was not their agent when the statement was made. The majority opinion relies on *Fakhoury v. Vapor Corp.*, 218 Ill. App. 3d 20, 578 N.E.2d 121 (1991), and *Beccue v. Rockford Park District*, 94 Ill. App. 2d 179, 236 N.E.2d 105 (1968), neither of which involves a guilty plea. Federal courts have held that a third-party guilty plea is admissible to prove any fact essential to the judgment. *E.g.*, *Rozier v. Ford Motor Co.*, 573 F.2d 1332, 1347 (5th Cir. 1978); *Estate of Chlopek v. Jarmusz*, 877 F. Supp. 1189, 1194 (N.D. Ill. 1995). I am persuaded that the trial court erred in barring the use of the GBMI plea to prove every material fact alleged in the indictment.

Finally, like the trial court, the majority opinion holds that it was proper to sever Lamson and exclude the prosecutor's statement

696

and the basis for the medical opinion on the ground that the details of the sexual assaults were more prejudicial than probative. As explained above, these facts were completely probative on the issues of causation and damages. The material facts alleged in the indictment are quite prejudicial, but not unfairly so. Moreover, it should be noted that the trial court believed this evidence was more prejudicial than probative, but permitted the unnecessary impeachment testimony of the defense attorney, despite the trial court's statement that the latter "would be devastating testimony to the Plaintiff's case." The contrast in the evidentiary rulings is stark and undeniable.

A similar attitude is suggested by the majority opinion's attempt to place at least part of the blame for the severance with plaintiff. 279 Ill. App. 3d at 688. Minor litigants are entitled to special protection by the courts; their rights are protected even from the neglect of their representative in order to do substantial justice. *E.g., Kim v. Evanston Hospital,* 240 Ill. App. 3d 881, 888, 608 N.E.2d 371, 376 (1992). The minor litigant in this case was not given special protection by the courts; substantial justice was not done. I cannot put an imprimatur upon these proceedings. Accordingly, I dissent.